## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

| | |
|---|---|
| WEST POINT SCHOOL BOARD; LAURA ABEL, in her official capacity as Division Superintendent; JONATHAN HOCHMAN, in his official capacity as Principal of West Point High School; and SUZANNE AUNSPACH, or her successor in office, in her official capacity as Assistant Principal of West Point High School, | No. 20-1940 |
| Appellants, | |
| v. | |
| PETER VLAMING, | |
| Appellee. | |

## MOTION OF JOHN DOE TO PROCEED UNDER A PSEUDONYM

John Doe (hereinafter "John" or "Doe"), who is moving for leave to intervene in this appeal, respectfully moves by his next friend Jane Roe to proceed under a pseudonym. He seeks this relief for himself and for his next friend due to the highly sensitive and private nature of the facts involved in this case, as well as the need to safeguard Doe's privacy and his physical and emotional wellbeing. The District Court granted Doe's motion to proceed under a pseudonym for purposes of the decision on appeal. Granting the same relief here in this Court will not prejudice the existing parties in this case.

Counsel for John Doe has conferred with counsel for the parties regarding the relief sought in this motion. Appellants consent to the relief requested in this motion. Appellee does not oppose John Doe's motion to proceed under a pseudonym, but does not consent to and intends to oppose Doe's request that the pseudonym be recognizably male.

## INTRODUCTION

John Doe (hereinafter "John" or "Doe") is a transgender male student who, while not named in this lawsuit, is intimately intertwined in its factual allegations and legal claims. He is the student Plaintiff-Appellee Peter Vlaming refused to refer to using male pronouns (both in class and in front of other students) and whose access to educational opportunities was impaired by Vlaming's conduct.

John began living as male towards the end of eighth grade. To the general public, John is simply male. Despite John's efforts to live his life as male, transitioning in a small school community has meant that some of John's peers know that he is transgender. That has led to John being the target of bullying and harassment at school and on social media, initially for being transgender and then for his perceived association with Vlaming's termination. These have included being subjected to slurs such as "faggot" and "tranny"; online bullying (with other students posting images of John on social media with derogatory comments); and threats that another student would shoot John or run over him with a car.

While a party's name is generally a matter of public record, this Court and numerous courts within this Circuit have repeatedly recognized that anonymity is warranted under certain circumstances. This is one of those cases. *First*, John's status as transgender is an intimate and private fact that John should be permitted to disclose only as he sees fit; indeed, numerous courts have concluded that an individual's transgender status is a sufficiently private matter to overcome default presumptions of disclosure. *Second*, John is a minor who has already been subjected to bullying and threats at school due to his (and his family's) perceived role in "causing" Vlaming's firing. Disclosure of John's identifying information would not only redouble these threats, but also expose his identity to the general public, which could exponentially increase the sources of that harassment.[1] *Third*, this case has already attracted significant media attention and will likely continue to do so. It is thus highly likely that the inclusion of John's initials on public filings, combined with the name of his next friend, would cause his identity to become widely publicized, following him into adulthood and inviting future harassment and discrimination. *Finally*, allowing John to proceed under a pseudonym would not

---

[1] Federal Rule of Appellate Procedure 25(a)(5) provides that an appeal whose privacy protections were governed by Federal Rule of Civil Procedure 5.2 in the district court is governed by the same rule on appeal. Although Rule 5.2(a)(3) requires any reference to John on the Court's docket to use his initials rather than his full name, the combination of John's initials with the legal name of his next friend would make John's name readily ascertainable to members of the public.

prejudice Vlaming or the School Board. John's identity is already known to them, John's identity has no bearing on the issues presented, and the inconvenience to the parties of redacting John's identifying information from public filings would be minimal.

John Doe, through his next friend Jane Roe, requests only the very minimal accommodation of proceeding as an intervenor without public disclosure of his identifying information through his initials and the name of his next friend. Numerous courts have held anonymity is appropriate in precisely these circumstances, and this Court should grant John's motion.

## BACKGROUND

John is a transgender boy who has been living as male in all aspects of his life since summer 2018.[2] *See* Declaration of John Doe in Support of Motion to Intervene and Motion to Proceed Under a Pseudonym ("Doe Intervention Decl.") ¶ 7.[3] John began his transition in eighth grade. *Id*. ¶ 3. He disclosed that he is transgender to his parents and began changing his outward appearance to match his male gender identity. *Id*. ¶ 3-4. He cut his hair and began wearing more androgynous clothing. *Id*. ¶ 3. By the end of eighth grade, he was living as male outside of school. *Id*. ¶ 6.

---

[2] Additional background not necessary for the resolution of this motion is provided in John Doe's accompanying motion to intervene, filed herewith.

[3] The Declaration of John Doe in Support of Motion to Intervene and Motion to Proceed Under a Pseudonym is filed as Exhibit A to John's accompanying Motion to Intervene.

Then, at his eighth-grade graduation, John started publicly using a masculine name with his peers and the school community. *Id*. ¶ 6. By the time John started high school at West Point High School in Fall 2018, he was living as male throughout his daily life. *Id*. ¶ 6-7.

Wanting to set John up for a good start to the year, John's parent met with his teachers, including Vlaming, before school began to notify them of his transition and to ask that they treat him as male for all purposes. In the prior two years, John and Vlaming had developed a good relationship. *Id*. ¶ 8. At the time, Vlaming provided no indication that he did not intend to honor John's request. *Id*. ¶ 8.

Soon after the school year began, students in Vlaming's class became aware—and alerted John—that Vlaming was taking steps to avoid addressing or referring to him as a male. *Id*. ¶ 12-13. As it was early in the school year, John had initially assumed that Vlaming's mistakes were inadvertent. *Id*. ¶ 12. Vlaming would use pronouns to refer to other students during classroom discussions, but he selectively avoided the use of pronouns for John, instead referring to him only by his first name, singling him out from his peers. *Id*. ¶ 12. On some occasions, Vlaming would use female pronouns when speaking about John. *Id*. ¶ 12. John also learned from other students of instances in which Vlaming had referred to John using female pronouns while John was not present. *Id*. ¶ 13.

John understood that adjusting to using his new name and male pronouns

5

might be challenging for some of his peers and teachers who had previously known him as a girl. *Id.* ¶ 9. John was prepared for inadvertent misuse of pronouns and did not view those occasional slip-ups as intentionally hurtful or damaging. *Id.* ¶ 9. Having heard Vlaming refer to him as female on multiple occasions, John hoped that Vlaming was not intentionally referring to him as female. *Id.* ¶ 14. Being singled out by one of his teachers in this manner, including in class and in the presence of other students, caused John significant emotional strain and distress. *Id.* ¶ 16. John's previously positive relationship with Vlaming made that treatment particularly jarring. *Id.* ¶ 15. John began to dread attending Vlaming's class, anxious at the uncertainty of how Vlaming would choose to refer to him. *Id.* ¶ 16. John worried that other students would observe Vlaming's behavior and conclude that it would be acceptable to refer to John as a female as well. *Id.* ¶ 16. Preparing for class became mentally exhausting and John had trouble focusing and engaging in all his classes because he was so anxious and worried about Vlaming's behavior and its potential repercussions. *Id.* ¶ 20. John's grades began to suffer. *Id.* ¶ 20.

John eventually decided to meet with Vlaming to express his discomfort with Vlaming's repeated use of female pronouns to refer to him and use of circuitous language to avoid referring to him as male. *Id.* ¶ 14. Vlaming initially attributed his use of female pronouns to inadvertent error. *Id.* ¶ 14. However, Vlaming then proceeded to make additional statements implying that his treatment of John had not

6

been accidental.  He told John he was "mourning the girl" John "used to be" and referenced "differences between gender and sexuality." *Id.* ¶ 14.  Later that evening, Vlaming called John's parent on the phone and said that he refused to acknowledge John's male identity because of his religious beliefs.  *Id.* ¶ 15.

On October 31, 2018, about a week after those conversations, Vlaming again referred to John as a female in front of his class, this time in a class exercise including a student who had previously been unaware that John was transgender.  *Id*. ¶ 18. Vlaming's conduct that day confirmed what John had feared—that Vlaming's references to him as female were not inadvertent.  *Id*. ¶ 19.  John was angry and embarrassed that Vlaming had referred to him as female in front of other students, especially those who were new to the school and had only ever known him as male. *Id*. ¶ 18-19.  John was frustrated and worried that those students would focus on his transgender status rather than getting to know him as a person and that Vlaming's actions would harm his ability to build new friendships in high school.  *Id*. ¶ 20.

John was also concerned that Vlaming's conduct would signal to students who were not accepting of John being transgender that it was permissible to mistreat John.  John knew that there were students at his school that did not accept his gender identity.  Since he began identifying and presenting as male, John had repeatedly been subjected to slurs such as "faggot" and "tranny" while at school.  *Id*. ¶ 10.  He had also been the object of cyberbullying, in which students have posted pictures of

John with derogatory comments. *Id*. ¶ 10.

Vlaming was placed on administrative leave the day following the October 31 class exercise. *See* Complaint ¶ 109, Doc. No. 1-2. After Vlaming was dismissed, some students blamed John and his family for Vlaming's dismissal and would hand John notes or post on social media that he was to blame for Vlaming losing his job. Doe Intervention Decl., ¶ 21. Vlaming's dismissal also drew attention to John's transgender status, and John experienced more frequent incidents of bullying and harassment around campus and on social media. *Id*. ¶ 21. In one incident, a student threatened to bring a gun to school and shoot John or run over John with his car. *Id*. ¶ 21. John's fear and anxiety were also heightened when he heard that another transgender student at West Point High School was physically assaulted by a student around this time. *Id*. ¶ 21.

John had a difficult start to his first year at West Point High School as the result of Vlaming's conduct and the public fallout from his termination. But the actions of school and district personnel in their dealings with Mr. Vlaming helped make John feel safer and more welcome. *Id*. ¶ 22. John obtained a legal name change and corrected his identity documents. *Id*. ¶ 7. To the wider public and his peers at school, he is known as male. *Id*. ¶ 6-7. He is concerned that his transgender status becoming more widely known among the public would put him at risk of additional harassment and discrimination, including online bullying and threats. *Id*.

¶ 23.  Although he is currently attending school via remote learning, drawing the attention of other students at West Point High School to his involvement in this lawsuit could invite further retaliation and bullying at school once it returns to in-person learning, inflicting emotional distress and interfering with John's ability to fully participate in his classes.  *Id*. ¶¶ 20, 23.

Vlaming filed suit against the West Point School Board in Circuit Court for the County of King William, Virginia on or around September 27, 2019.  Notice of Removal 1 ¶¶ 1-2, Doc. 1.  Vlaming's lawsuit received widespread media attention, causing John concern that his name could become public.  Doe Intervention Decl. at ¶ 23.

The School Board filed a notice of removal in the district court on October 22, 2019.  *See* Notice of Removal, Doc. No. 1.  Vlaming filed a motion to remand on November 21, 2019, *see* Motion to Remand, Doc. No. 5, and John filed a motion to intervene and motion for leave to proceed pseudonymously in the district court four days later, on November 25, 2019.  *See* Motion to Intervene, Doc. No. 7; Memorandum in Support of Motion to Intervene, Doc. No. 8; Motion for Leave to Proceed Pseudonymously, Doc. No. 10.  On December 5, 2019, John and the School Board separately filed oppositions to Vlaming's remand motion.  *See* John Doe's Opposition to Vlaming's Motion to Remand, Doc. No. 22; Plaintiff's Opposition to Vlaming's Motion to Remand, Doc. No. 23.  On August 19, 2020, the district court

9

granted Vlaming's Motion to Remand and further granted John's motion to proceed pseudonymously, but did not reach the substance of John's motion to intervene. *See* Order Granting Motion to Remand, Doc. No. 37. John Doe is moving to intervene simultaneously with this motion.

## ARGUMENT

The presumptive rule under the Federal Rules of Appellate Procedure is that the identities of the parties are included on briefs and motions filed. *See* Fed. R. App. P. 27(d)(1)(B); 32(a)(2)(E). But, "in exceptional circumstances, compelling concerns relating to personal privacy or confidentiality may warrant some degree of anonymity in judicial proceedings, including use of a pseudonym." *Doe v. Pub. Citizen*, 749 F.3d 246, 273 (4th Cir. 2014). This Court has identified several nonexclusive factors that should be considered in evaluating a motion to proceed pseudonymously:

> [W]hether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature; whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; the ages of the persons whose privacy interests are sought to be protected; whether the action is against a governmental or private party; and, relatedly, the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993).

## ARGUMENT

John is precisely the type of litigant the Fourth Circuit's standard was

designed to protect by use of a pseudonym. As the district court noted in its order allowing John to proceed under a pseudonym, John "is a minor and this case raises significant privacy concerns associated with revealing [his] name and initials to the general public." Order Granting Motion to Remand 1 n.1, Doc. No. 37. Further, has already been subjected to bullying and threats at school due to his transgender status and his (and his family's) perceived role in the investigation and ultimate disciplinary actions against Vlaming. Granting John leave to proceed under a pseudonym would safeguard against wider public disclosure of John's transgender status and other intimate information and protect him and his family from further harassment and discrimination as this case continues to garner significant attention—locally and in national media. None of the existing parties would be prejudiced by allowing John to proceed by a pseudonym.

## I.     Revealing Doe's Identifying Information Would Require Him To Disclose Information Concerning a Matter of Sensitive and Highly Personal Nature.

Permitting John and his next friend to proceed under pseudonyms is necessary to "preserve privacy in a matter of sensitive and highly personal nature." *James v. Jacobson*, 6 F.3d at 238. Numerous courts have concluded that an individual's transgender status is a sufficiently private matter to warrant overcoming courts' presumption of disclosure. *See, e.g.*, *Foster v. Andersen*, No. 18-2552-DDC-KGG, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019); *Doe v. City of Detroit*, No. 18-CV-

11295, 2018 WL 3434345, at *2 (E.D. Mich. July 17, 2018); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, No. 2:16-CV-524, 2016 WL 4269080, at *5 (S.D. Ohio Aug. 15, 2016); *Doe v. Blue Cross & Blue Shield of R.I.*, 794 F. Supp. 72, 72 (D.R.I. 1992); *Doe v. McConn*, 489 F. Supp. 76, 77 (S.D. Tex. 1980); *McClure v. Harris*, 503 F. Supp. 409, 412 (N.D. Cal. 1980), *rev'd on other grounds sub nom. Schweiker v. McClure*, 456 U.S. 188 (1982).  Simply put, "Doe's identity as a transgender [man] is a matter 'of the utmost intimacy.'"  *Meriwether v. Trustees of Shawnee State Univ.*, No. 1:18-CV-753, 2019 WL 2392958, at *3 (S.D. Ohio Jan. 30, 2019) (quoting *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004)).

*Meriwether* is particularly instructive here.  In *Meriwether*, a transgender student sought to intervene under a pseudonym to defend her right to an education free from discrimination against claims by a professor who claimed a free-speech and free-exercise right to violate the school's anti-discrimination policies.  The intervenor student had shared her transgender status with some people on campus, but otherwise kept that information private and took measures to prevent the disclosure of that information.  The court granted the motion, agreeing that even where the intervenor student's transgender identity is "not a complete secret," and where some of her peers and school administrators "knew that she had transitioned from male to female," her transgender identity nonetheless "certainly qualifie[d] as information 'of the utmost intimacy'" since "the general public was not aware of this

fact." *Meriwether*, 2019 WL 2392958, at *3 (citing *City of Detroit*, 2018 WL 3434345, at *2).

Doe's motion here presents virtually the same facts, except that the student intervenor in *Meriwether* was an adult, whereas John is still a minor. *See* Part III *infra*. John lives as male. He legally changed his name and corrected his identity documents to ensure that he is treated as male in all aspects of his life. Doe Intervention Decl. ¶ 7. Although some of his fellow students are aware that he is transgender, many others at his school are not. Indeed, among the reasons that John was upset with Vlaming's conduct as a teacher is that it publicized John's transgender status to other students. *Id*. ¶ 18-19. In at least one incident, Vlaming's conduct had the effect of identifying John as transgender to another student whom John understands was not previously aware of that fact. *Id*. ¶ 18. Unlike in *Meriwether*, where the student's name had been widely reported, John's identity (while known to some within his immediate school community) is not known to the general public, presenting an even stronger case that it should not be further publicized through this litigation.

Without the protection of pseudonyms for himself and his next friend, John's transgender status would become publicly available information, frustrating his efforts to keep his personal information private and safeguard his privacy right in that information. *Id*. ¶ 23. Requiring John to identify himself to the public in order

to participate in the litigation would also have the paradoxical effect of undermining the very privacy interest he seeks to vindicate through his proposed intervention.

## II. Publicizing Doe's Identifying Information Would Risk Unnecessarily Exposing Him to Retaliation.

John also has an important interest in ensuring that his participation as an intervenor in this lawsuit does not expose him, or members of his immediate family, which includes a minor sibling, to additional harassment or threats of harm, which could be aggravated by the significant publicity this case has received to date. As set forth at *Id.* ¶ 10, 21, John has already faced harassment and bullying from other students at his school due to his transgender status and his connection with Vlaming's termination, even before the initiation of this lawsuit. These have included being repeatedly subjected to slurs such as "faggot" and "tranny"; being the target of online bullying (with other students posting images of John on social media with derogatory comments); and receiving threats of physical harm. *Id.* ¶ 10, 21.[4]

In *Doe v. Stegall*, 653 F.2d 180 (5th Cir. 1981)—which the Fourth Circuit cited favorably in *James*—the court considered a request for anonymity by minors

---

[4] As set forth in John Doe's accompanying motion to intervene, the mistreatment and bullying that John has experienced and to which he is vulnerable as a transgender student gives him a particularized and personal interest in ensuring that the School District is able to enforce its anti-discrimination and anti-harassment policies to protect transgender students from discrimination and harassment, and that school personnel are able to administer and apply it in a meaningful fashion.

challenging school-sponsored religious ceremonies and compelled prayer in a public middle school.  The court found that the fact that the plaintiffs' views were not mainstream and had been the subject to immense criticism and threats of violence counseled strongly in favor of anonymity.  *See id.* at 186.  The court analogized the "opprobrium" against the plaintiffs with "the infamy associated with criminal behavior," and noted that evidence "indicate[d] that the Does may expect extensive harassment and perhaps even violent reprisals if their identities are disclosed."  *Id.*  Although the mere "threat of hostile public reaction to a lawsuit, standing alone" would not be sufficient to justify anonymity, the court reasoned, the "threats of violence generated by this case, in conjunction with the other factors weighing in favor of maintaining the Does' anonymity, tip the balance against the customary practice of judicial openness."  *Id.*

These concerns are particularly amplified in this case due to the significant amount of news coverage the case has already received.  Media attention has included not only local but also national and international outlets.  The Richmond-Times Dispatch,[5] The Virginia Gazette,[6] The Washington Post,[7] The Washington

---

[5] https://www.richmond.com/news/virginia/virginia-high-school-teacher-fired-for-refusing-to-use-transgender/
article_65be1826-50b2-5d38-be58-47d9b9480917.html

[6] https://www.dailypress.com/virginiagazette/va-vg-tr-wp-wphs-vlaming-2018recap-20181220-story.html

[7] https://www.washingtonpost.com/nation/2019/10/01/virginia-teacher-fired-not-using-transgender-pronouns-sues-school/

Times,[8] ABC News,[9] CNN,[10] CBS News,[11] Forbes,[12] The Huffington Post,[13] The News & Observer,[14] The Heritage Foundation,[15] The Christian Post,[16] BuzzFeed News,[17] Slate,[18] The Independent (U.K.),[19] The Guardian (U.K.),[20] and News Corp.

---

[8] https://www.washingtontimes.com/news/2019/oct/1/peter-vlaming-fired-teacher-sues-va-school-used-wr/

[9] https://abcnews.go.com/US/virginia-teacher-sues-fired-alleged-transgender-discrimination/story?id=65996209

[10] https://www.cnn.com/2019/10/07/opinions/teachers-misgendering-students-creates-hostility-hope/index.html

[11] https://www.cbsnews.com/news/richmond-teacher-suing-peter-vlaming-fired-refusing-transgender-students-preferred-pronouns-sues-virginia-school/

[12] https://www.forbes.com/sites/evangerstmann/2019/10/03/virginia-school-district-fires-teacher-who-wouldnt-refer-to-transgender-student-using-male-pronouns/#125bdc076ed5

[13] https://www.huffpost.com/entry/peter-vlaming-transgender-student-lawsuit_n_5d9600bce4b02911e116d773

[14] https://www.newsobserver.com/news/nation-world/national/article235706997.html

[15] https://www.heritage.org/gender/commentary/teacher-was-fired-misgendering-student-who-could-be-next

[16] https://www.christianpost.com/news/they-didnt-want-to-listen-teacher-fired-for-not-using-transgender-students-chosen-pronouns-speaks-out.html

[17] https://www.buzzfeednews.com/article/juliareinstein/teacher-fired-transgender-student-west-point-high-lawsuit

[18] https://slate.com/news-and-politics/2019/10/virginia-french-teacher-fired-student-transgender-pronouns-lawsuit-religious-discrimination.html

[19] https://www.independent.co.uk/news/world/americas/teacher-sacked-trans-student-pronoun-female-male-virgina-west-point-high-school-a8672031.html

[20] https://www.theguardian.com/us-news/2019/oct/01/virginia-teacher-sues-after-being-fired-for-refusing-to-call-trans-student-he

Australia[21] have all run stories highlighting Vlaming's complaint. If John's identifying information were to appear in public filings and orders, widespread public dissemination of his name through the news media would likely follow. *See Doe v. The Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d 583, 593 (E.D. Va. 2016) (granting motion to proceed under pseudonym where the "threat [of violence] is all the more serious given that this case has drawn significant media attention, which means many people across the country are aware of [the] accusations against [the party]."). Such widespread coverage would not only force John to sacrifice important privacy interests in his status as a transgender male by broadcasting them to the world, *see* Part I *infra*, but could readily expose him to increased harassment and threats from persons beyond his immediate school community.

## III. Doe's Status as A Minor Weighs Against Disclosure.

The fact that John is a minor provides additional justification to allow him to proceed under a pseudonym. The Fourth Circuit has noted that courts should consider "the ages of the persons whose privacy interests are sought to be protected." *James*, 6 F.3d at 238. And multiple courts have granted motions for transgender individuals to proceed under pseudonyms in part because those individuals are

---

[21] https://www.news.com.au/finance/work/at-work/teacher-sacked-for-refusing-to-use-transgender-students-pronouns-sues-school-district/news-story/0cb69ebad0a17a441e06fb3ead9a551c

minors. *See Highland Local Sch. Dist.*, 2016 WL 4269080, at *5 (granting motion to proceed under pseudonym in part because "[c]hildren are especially entitled to privacy particularly when they have previously recounted retaliation or harassment"); *Doe v. United States*, No. 16-CV-0640-SMY-DGW, 2016 WL 3476313, at *1 (S.D. Ill. June 27, 2016) (granting such a motion and adding that F.R.C.P. 5.2(a) "restricts filings to protect the privacy of minors"). As those courts have also recognized, the transgender minor's next friend or legal guardian must also be permitted to file under a pseudonym to provide these vulnerable minors the full benefit of the court's protection. *See Doe v. United States*, 2016 WL 3476313, at *1.

## IV.    The Interests of the Parties and of the Public Would be Unaffected by the Relief Requested.

Finally, there is no public interest in the disclosure of John's identifying information, nor any prejudice to the existing parties, from allowing him and his next friend to proceed under a pseudonym.

The Fourth Circuit has instructed courts to consider "whether the action is against a governmental or private party; and, relatedly, the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously." *James*, 6 F.3d at 238. Although the School Board is a governmental entity, the public interest in cases where "the defendants are government officials sued in an official capacity" does not weigh against the relief requested. *George Mason Univ.*, 179 F.

Supp. 3d at 594. Whatever public interest may exist in the subject matter of the litigation, John's identifying information and identity are not pertinent to it. John is not himself suing governmental officials or entities. He is merely seeking to defend his right to an education free from discrimination, which would be significantly impaired if the Court were to rule in Vlaming's favor. And even if there were such a public interest, it would not be compromised by the relief requested; as this district held in *George Mason University*:

> [T]he use of a pseudonym is an appropriately tailored means of protecting [the parties'] interests without unduly restricting public access to the litigation materials. Indeed, to the extent the public has a heightened interest in litigation against the government, "the public's strong interest in monitoring the position that government agencies take in litigation" is vindicated here because the public has full access to everything the government has filed with the exception of [the anonymous parties'] identities.

*Id.* (internal alterations and citations omitted)

The fact that the existing parties to the litigation are already familiar with John and know his identity also weigh in favor of granting the motion. *See, e.g.*, *Doe v. United Servs. Life Ins. Co.*, 123 F.R.D. 437, 439 (S.D.N.Y. 1988) (holding that the fact that government was a party to a case should not weigh against permitting anonymity because the government "already [knew] Doe's true identity, it [would] have full discovery rights as the case progresse[d], and it [would] only be barred from using or disclosing the fruits of its discovery for purposes other than the defense of this action."). Both Vlaming and the School Board know who John is. In the

event this case proceeds to discovery, the parties already have the ability to contact him to issue whatever discovery requests are ultimately appropriate for the scope of the action, as well as to use their knowledge of his name to locate pertinent discovery materials exchanged with one another or obtained from third parties. The only impact on the existing parties from granting the motion would be the minimal effort that is required to ensure that they do not post John's identifying information on the public docket.[22] Vlaming's compliance with this requirement in his filings to date demonstrates that it would not be burdensome and John asks only that the existing parties continue to do the same in future public filings.

## CONCLUSION

Proposed Intervenor John Doe respectfully requests that the Court enter an order permitting him and his next friend to proceed under a pseudonym and directing the parties to refrain from posting his identifying information on the Court's docket.

Respectfully submitted,

[Signature Block on Following Page]

---

[22] Identifying information includes the names of John Doe's parents, as those would have the effect of identifying John himself.

Dated:  September 23, 2020                    Respectfully submitted,


JENNER & BLOCK LLP


 /s/ Luke Platzer

Luke Platzer                                  Asaf Orr
*Counsel of Record*                           Shannon Minter
1099 New York Avenue, NW                      NATIONAL CENTER FOR
Washington, DC 20001                          LESBIAN RIGHTS
Telephone: (202) 639-6000                     870 Market Street, Suite 370
Facsimile: (202) 639-6066                     San Francisco, CA 94102
lplatzer@jenner.com                           Telephone: (415) 365-1326
                                              Facsimile: (415) 392-8442
Cayman Mitchell                               aorr@nclrights.org
919 Third Avenue
New York, NY 10022
Telephone: (212) 891-1600
Facsimile: (212) 891-1699                     *Counsel for John Doe*


Kristen Green
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone: (213) 239-5100
Facsimile: (213) 239-5199

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Motion for Leave to Intervene complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2) because it contains 4,657 words. I further certify that this Motion complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point font.

  /s/ Luke Platzer
Luke Platzer
*Counsel of Record*
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for John Doe*